UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

PETER QUIGLEY,

          Plaintiff,

   v.

BAY STATE CRUCIBLE CO., INC.,

          Defendant.

C.A. No. 18-11131

## COMPLAINT FOR SPECIFIC PERFORMANCE

### Nature Of Action

This is an action for specific performance of an agreement by plaintiff to purchase, and by defendant to sell, the assets of defendant.

### Jurisdiction And Venue

1.     Plaintiff is a citizen of Pennsylvania.

2.     Defendant is a Massachusetts corporation with a principal place of business in Taunton, Massachusetts.  Defendant therefore is a citizen of Massachusetts.

3.     The parties therefore are of diverse citizenship.

4.     The purchase price under the agreement at issue exceeds $75,000.

5.     The amount in controversy therefore exceeds $75,000.

6.     Because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, the Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1).

7.     Defendant is a resident of this judicial district under 28 U.S.C. § 1391(c)(2).

8.     Venue for this civil action therefore is proper in this judicial district under 28 U.S.C. § 1391(b)(1).

## Facts

### The Parties And Affiliates

9.     Plaintiff, Peter Quigley, lives in Wayne, Pennsylvania.

10.    Mr. Quigley is a ceramic engineer.

11.    Mr. Quigley is the principal of Quigley Crucible, Refractories & Specialties Co. Inc., of Bridgeport, Pennsylvania ("Quigley Refractories").

12.    Quigley Refractories distributes crucibles and other refractory materials in which metals are melted or subjected to high temperatures.

13.    Mr. Quigley has decades of experience in the refractory materials field.

14.    Defendant, Bay State Crucible Co., Inc. ("BSC"), is located at 740 West Water Street, Taunton, Massachusetts.

15.    BSC manufactures crucibles in a plant at said location.

16.    The plant is in (at best) fair condition and is in need of a substantial capital investment and improvements.

17.    BSC owns the real property on which the plant is located.

18.    The real property is bordered by a sewage pumping station on the north and a sewage treatment plant on the south.

### Mr. Quigley's Background With Mr. Tripp

19.    Until recently, BSC was run by Bradford Tripp.

20.    Quigley Crucibles has purchased crucibles from BSC for decades.

21.     As a result, Mr. Quigley and Mr. Tripp got to know each other quite well.

22.     Mr. Quigley became very fond of Mr. Tripp and developed a great deal of respect for him.

**Mr. Tripp's Illness, Mrs. Tripp's Involvement, Mr. Quigley's Assistance**

23.     Several years ago, Susan Tripp, Brad Tripp's wife, called Mr. Quigley to discuss problems she was having with BSC.

24.     She disclosed that Mr. Tripp had health problems.

25.     Mr. Quigley came to learn that Mr. Tripp is suffering from early-onset Alzheimer's disease.

26.     Upon information and belief, Mrs. Tripp, who is a Director and Secretary of BSC, has been running BSC since at least her call to Mr. Quigley several years ago.

27.     During that call, Mrs. Tripp went into detail about the fact that BSC's sales had been dropping.

28.     She asked Mr. Quigley for help.   After a long discussion, Mr. Quigley recommended that Mrs. Tripp hire a general manager, get a managing partner, or sell the company.

29.     Sometime later, the quality of BSC products declined substantially.

30.     Mr. Quigley discussed this at length with Mrs. Tripp and recommended a solution, which was successfully implemented.

31.     Mr. Quigley and Mrs. Tripp subsequently discussed the possibility of Mr. Quigley becoming a co-owner in BSC.

32.     After consideration, Mr. Quigley declined.

33.     Thereafter, Mrs. Tripp told Mr. Quigley that she wanted to hire a manager and asked him to assist her in finding one.

34.     Mr. Quigley referred two good prospects to Mrs. Tripp.

35.     Ms. Tripp told Mr. Quigley that she could not afford to hire either of them.

**The Beginning Of The Negotiations**

36.     In late 2016, Mr. Quigley called Mrs. Tripp and told her he would be interested in buying BSC.

37.     Mrs. Tripp responded that she would have to think about it.

38.     On January 13, 2017, Mrs. Tripp emailed Mr. Quigley as follows:

> Thank you for your call before Christmas in regard to your interest in buying Bay State. I have had some time to think about it and your concerns in the future of Bay State. I have asked some close confidents [sic] with business back grounds to advise me on what is best both for the business and for our future. There are some decisions to be made which cannot happen overnight. I hope that you can be patient and continue to support Bay State.

**The Appearance Of Mr. O'Brien**

39.     Three months later, on April 12, 2017, Mrs. Tripp e-mailed Mr. Quigley again, as follows:

> How are you? I am emailing you to ask if a family friend could contact you in regards to Bay State. His name is Jamie O'Brien, he has heard me speak of the history between Quigley Crucible and Bay State.

40.     Upon information and belief, Mr. O'Brien is the founder and managing member of Promethean Capital Group, LLC, a Delaware limited liability company that specializes in financing solutions for corporations, covering the entire capital structure spectrum, from common equity through secured debt and combinations and hybrids between.

41.     Upon information and belief, Mr. O'Brien has extensive experience in corporate finance and extensive experience negotiating corporate transactions.

**The First Round Of Negotiations**

42.     Almost immediately after Mrs. Tripp's April 12, 2017, email, Mr. Quigley and Mr. O'Brien began to communicate; during April and May 2017, they had numerous telephone conversations and exchanged many text messages and emails.

43.     On April 20, 2017, Mr. Quigley emailed Mr. O'Brien, providing, among other things, a "list of items I think would help [Mrs. Tripp], you and I put a fair value on" BSC.

44.     On April 25, 2017, Mr. O'Brien provided to Mr. Quigley a proposed confidentiality agreement.

45.     On April 28, 2017, Mr. Quigley asked Mr. O'Brien for permission to show the proposed confidentiality agreement to an attorney and asked on progress compiling the information on BSC that he had requested via his list.  Mr. O'Brien responded that same day, approving the request to share the proposed confidentiality agreement and indicating that he would have further input on the information request soon.

46.     On May 2, 2017, Mr. Quigley signed the confidentiality agreement and sent it to Mr. O'Brien, asking that he have Mrs. Tripp sign the agreement and return it to Mr. Quigley.

47.     Mrs. Tripp signed the confidentiality agreement.  The signature block she signed states:

Bay State Crucible Co., Inc.


_____
Susan Tripp
Owner & duly authorized

48.     On May 2, 2017, Mr. O'Brien forwarded to Mr. Quigley extensive information on BSC's operations that Mr. Quigley had requested.  He observed that, "[i]f there's a deal to be done here, I'd like to arrange for you to visit as quickly as possible to be sensitive to your

daughter's upcoming surgery as well as everyone's time and business interests." Mr. O'Brien went on to propose to Mr. Quigley that:

1. You review the information
2. You develop and communicate to me a valuation range that you are considering . . . non-binding and as narrow or as broad as you would like
3. I consult with [Mrs. Tripp] immediately and
4. If your range includes a value at which [Mrs. Tripp] would consider selling, we schedule your visit and if not, we spare you the time and effort of making the trip up here

49.     Mr. Quigley thanked Mr. O'Brien for the information and promised to review it that evening.

50.     Later that same day, Mr. O'Brien indicated to Mr. Quigley that he could ignore that "auto/truck line item" on the financial statements, as "they will keep those vehicles."

51.     A short while later, Mr. Quigley asked if it was okay for him to share with his accountant the information Mr. O'Brien has provided, and Mr. O'Brien said yes.

52.     On May 8, 2017, Mr. O'Brien sent to Mr. Quigley, copying Mrs. Tripp, draft financials of BSC through April 20, 2017.

53.     On May 9, 2017, Mr. Quigley emailed Mr. O'Brien, noting, among other things, that the financials provided on May 8 made "it appear like the plant is running on fumes." Mr. Quigley asked Mr. O'Brien to discuss a reasonable asking price with Mrs. Tripp and to let Mr. Quigley know.

54.     Mr. O'Brien responded a short while later, indicating that he thought Mr. Quigley should "provide some range of values which you're considering based upon what you've seen, subject of course to a visit and any further research on your part, etc." He said that, if Mr. Quigley's range included a value at which Mrs. Tripp would be prepared to sell, then a visit to

BSC could be arranged.  If it did not, then Mrs. Tripp/Mr. O'Brien could focus on different approaches.

    55.    Mr. Quigley responded to Mr. O'Brien on May 10, 2017, noting the changed financial picture of BSC and asking that Mr. O'Brien provide a "reasonable asking price for Bay State Crucible."

    56.    Mr. O'Brien responded by lengthy email on May 11, 2017.  He noted that he thought Mrs. Tripp should remove herself from the day-to-day burden of both running BSC and managing her family, and that she agreed.  He said that his experience in "hundreds of completed transactions involving businesses" was that the investor made a proposal indicating the terms or price.  He indicated that, "to protect [Mrs. Tripp], I cannot and will not suggest that she put a price on the table."

    57.    Mr. Quigley responded on May 13, 2017.  After commenting at length on the BSC situation – including his efforts to help Mrs. Tripp, the steps necessary to turn the business around, and the substantial cost (monetary and otherwise) of those steps – Mr. Quigley said that, based on the April 20, 2017 financials and assuming Mrs. Tripp planned to retain the "auto & truck 'value,'" "the company [was] worth $450,000 to $650,000 for a cash transaction."  He noted that "[n]o buyer/manager however without big money to invest over the next 5 years will have a shot at turning [BSC] around."

    58.    In mid-May 2017, Mr. O'Brien proposed a partnership between Mr. Quigley and Mrs. Tripp.  On May 17, 2017, Mr. Quigley indicated that this would not work, explained why, and asked Mr. O'Brien to let him know if Mrs. Tripp was interested in moving forward with the sale.

59.     Toward the end of May 2017, Mr. O'Brien advised Mr. Quigley during a telephone call that Mr. Quigley's range – $450,000 to $650,000 – was close to Mrs. Tripp's requirements.

60.     On May 25, 2017, Mr. O'Brien emailed additional financial information to Mr. Quigley, copying Mrs. Tripp on the email.  Mr. Quigley thanked Mr. O'Brien, indicated that he would review the material, raised a question about one apparent discrepancy, and said that he thought his "best course of action will be to review the information provided, tour [BSC] when agreeable to [Mrs. Tripp] then (sic) make an offer to purchase the assets of Bay State." He asked when he would be able to inspect the buildings, etc., of BSC.

61.     At the end of May, Mr. O'Brien, Mr. Quigley, and Mrs. Tripp worked on arranging Mr. Quigley's visit to BSC.  Mr. Quigley asked how Mr. O'Brien and Mrs. Tripp wished Mr. Quigley to be portrayed during his plant visit, and Mr. O'Brien indicated that Mrs. Tripp would tell the employees that Mr. Quigley was considering a substantial investment in or acquisition of the company.

62.     Mr. Quigley travelled to Taunton on June 12, 2017.  That day and the next, he inspected BSC and met with Mrs. Tripp and Mr. O'Brien.

63.     The inspection confirmed Mr. Quigley's belief that turning BSC around would require a substantial investment in time and money.

64.     Mr. Quigley and Mr. O'Brien had lunch together on June 12, 2017.  Mrs. Tripp was not present.  (At just about 11:00 p.m. the night before, she emailed Mr. Quigley advising that she would need to leave BSC at 1:45 p.m. on the 12th.)

65.     During the lunch, Mr. Quigley asked Mr. O'Brien if Mrs. Tripp would pay for part of the environmental testing that would be required for the transaction. Mr. O'Brien said that she would not.

66.     Mr. Quigley also asked about asset allocation, i.e., how the purchase price – which had not been agreed-upon yet – would be allocated among the various assets (real estate, equipment, inventory) that Mr. Quigley was to purchase. Mr. O'Brien advised Mr. Quigley that asset allocation should be addressed after an agreement was reached but prior to closing, explaining that, to get the deal done, he wanted Mrs. Tripp to focus her attention on important matters.

67.     How the purchase price was (and is) to be allocated among the various assets was (and is) not an important deal point for Mr. Quigley or a material term: So long as the allocation comported/comports with the law and objective reality, BSC can allocate as it wishes.

68.     On June 14, 2017, Mr. Quigley emailed Mrs. Tripp several times, copying Mr. O'Brien each time.

69.     In the emails, Mr. Quigley expressed pleasantries, asked for additional information concerning BSC, and asked for permission to provide information about BSC (and to involve) various specialists, including a development consultant, a real estate valuation specialist, and environmental testing contractor, to evaluate and value the assets. Mr. Quigley also noted that Mr. O'Brien had agreed that these steps were necessary before a purchase of BSC.

70.     On June 15, 2017, Mrs. Tripp emailed Mr. Quigley, providing permission to "go ahead with a property valuation" and indicating that she was gathering some of the information he had requested.

71.     On June 20, 2017, Mrs. Tripp provided some information to Mr. Quigley concerning the plant lay out and inventory, including a copy of the deed to the BSC real property.

72.     On June 26, 2017, Mrs. Tripp gave Mr. Quigley permission to contact an attorney regarding the purchase of BSC.

73.     On July 20, 2017, after reviewing and considering additional information on BSC, Mr. Quigley emailed to Mrs. Tripp, copying Mr. O'Brien, an offer to purchase most of BSC's assets.  The offer was preceded by a discussion of multiple discrepancies between what had been represented to Mr. Quigley concerning assets and reality, and of the difficulties the business was facing.

74.     In summary, Mr. Quigley offered, for the assets of BSC, $500,000 in cash, with Mrs. Tripp retaining the cash in BSC's account(s) in excess of $100,000 (there was over $275,000 on April 30, 2017) plus BSC's "autos and trucks," reported in the financial statements to be worth $129,547.

75.     Mr. Quigley noted that he would want a signed agreement that sales and technical information was not and would not be provided to anyone.

76.     Mr. Quigley noted also that the property required environmental investigation and approval at his cost, i.e., he would have the right not to close if the environmental investigation showed contamination.

77.     On July 21, 2017, Mr. O'Brien indicated that the offer was about $150,000 too low.

78.     On July 23, 2017, Mr. Quigley increased the offer, indicating that Mrs. Tripp could keep BSC's accounts receivable.

79.     By email dated July 24, 2017, Mr. O'Brien indicated that Mrs. Tripp was not prepared to accept Mr. Quigley's increased offer.  Mr. Quigley responded that it might be best to wait for and consider the BSC year-end statements, anticipated to issue sometime after the company's fiscal year ended on October 31, 2017.

**The Second Round Of Negotiations**

80.     On October 25, 2017, Mr. Quigley emailed Mrs. Tripp, stating

A few months ago I had mentioned to Jamie that we could take another look at the #'s after the Bay State Crucible year ends if you are interested in doing so.  I believe your fiscal year ends on October 31st.  Are you still interested in selling Bay State?  If so, when does your accountant normally have your year end reports for review?  In the interim could you please forward your August and September sales figures and the October figure when it is available?

81.     On October 31, 2017, Mrs. Tripp responded, "Any discussion regarding Bay State Crucible and the possible sale of it is to be discussed and negotiated with Jamie O' Brien.  I have forward your email to Jamie, he will respond to you directly."

82.     On November 1, 2017, Mr. Quigley emailed Mr. O'Brien, asking that, if Mrs. Tripp was still interested in selling BSC, he forward to Mr. Quigley BSC's sales figures for August, September, and October, and asking if Mrs. Tripp had changed her mind on overall value/sales price.

83.     Mr. O'Brien advised Mr. Quigley that Mrs. Tripp was still planning to sell BSC and that two other parties had expressed interest in it.  One of the two, he said, was preparing to submit an offer.  He advised Mr. Quigley that, unless he had "gotten more comfortable with a somewhat higher number than when we last spoke," they should see how things develop with the other party.  He added, "I can be back to you once know more about where they stand and let you know whether I think it's useful for you to re-engage."

84.     In late December 2017, Mr. Quigley called Mrs. Tripp to let her know that a highly qualified foundry plant manager was looking for a job in the northeast and might be available for hire by BSC.  About two weeks later, Mrs. Tripp responded by email, saying:

> Unfortunately I am unable to give you an answer about hiring your colleague at this time.  There is a party very interested in acquiring BSC, they have given me reassurance in the questions and visits regarding BSC that they are serious. Of course if something does change and we change our course in BSC future I would let you know.  I appreciate you looking out for BSC and please thank your colleague for his patience with me.

85.     On January 12, 2018, Mr. Quigley emailed Mr. O'Brien, mentioning his prior offer for most of BSC's assets, and noted that, given the opportunity to hire the manager whom he had mentioned to Mrs. Tripp, he would "feel comfortable offering more."  He asked Mr. O'Brien to let him know as soon as possible whether Mrs. Tripp was open to discussion.  Mr. O'Brien responded in the affirmative immediately, and the negotiations resumed.

86.     By email dated January 18, 2018, Mr. Quigley asked Mr. O'Brien to provide certain financial and other information, including information concerning developments relating to, among other things, employees, equipment, and environmental concerns.

87.     On January 30, 2018, Mrs. Tripp responded to some of Mr. Quigley's inquiries and provided requested financial information, asserting that there had been no developments.

88.     On February 6, 2018, Mr. Quigley emailed Mr. O'Brien.  He attached three documents to the email.

89.     In the email, Mr. Quigley noted that he had requested certain financial information and that the information he had just received indicated that "Bay State is in worse shape now than 1 year or even only 6 months ago." He went on to say that he understood Mrs. Tripp's "problems/concerns" and therefore would base his offer for BSC on the financial condition as to October 31, 2017 (i.e., effectively ignoring the then recent decline).  He noted

that his "cash offer for 'the assets' of" BSC was attached.  He asked for a response within two days, and said that, if the response were in the affirmative, he would get to work on having an attorney draw up an agreement and the environmental investigation that was a pre-condition to closing, and would visit BSC the next week for a thorough inspection.

90.     The offer attached to the February 6, 2018 email included all of the material terms of the proposed transaction:  It identified what Mr. Quigley was offering to purchase and what he was offering to pay.  Under the offer, Mrs. Tripp (BSC) was to receive (1) $600,000 in cash (a $100,000 increase over the July 2017 offer), (2) the cash in BSC's bank account(s) minus $100,000, (3) the "autos and trucks" referenced in BSC's financial statements, and (4) the accounts receivable; and Mr. Quigley was to receive the other assets of BSC and an agreement stating that sales and technical information was not and would not be given or sold to anyone. The offer provided, as did the July 2017 offer, that the price paid for certain variable-value assets, e.g., inventories, would be adjusted at closing to account for changes between the report dates and the closing.   Mr. Quigley and Mr. O'Brien had discussed in detail the price adjustments to reflect changed circumstances that would be necessary before closing, and there was complete understanding and agreement on the subject.  Indeed, with respect to inventories in particular, Mr. Quigley's offer implemented an approach recommended by Mr. O'Brien.

91.     On the evening of February 6, 2018, Mr. Quigley sent a text message to Mr. O'Brien, advising that he had just emailed to Mr. O'Brien an updated offer, and noting that the proposed deal gave Mrs. Tripp "about $900,000 plus the vehicles. (That assumes the inventories were valued correctly on 10/31/17)."

92.     On the morning of February 8, 2018, Mr. O'Brien, who indicated that he was in New York City, sent a text message to Mr. Quigley, stating, "I just received an email from

Susan, which states the terms on which she would like to sell to you.  At first glance, I believe

they are consistent with what you had offered but I need to spend a bit of time reviewing and

then speak with [Mrs. Tripp] to make sure everyone is on the same page."

93.     Over the course of the next several hours, Mr. O'Brien and Mr. Quigley

exchanged text messages, with Mr. O'Brien relaying concerns reportedly expressed by Mrs.

Tripp concerning the terms of the proposed deal.

**The Final Offer**

94.     The exchanges prompted Mr. Quigley to increase his offer, and, at 6:45 p.m. on

February 8, 2018, he emailed to Mr. O'Brien his "final offer."

95.     The final offer provided that Mrs. Tripp would receive for the "assets discussed"

(1) $550,000 in cash from Mr. Quigley (subject to the adjustment noted below), (2) all of the

cash BSC had in the bank at the time of closing (approximately $270,000 as of October 31, 2017,

the company's year-end reporting date), (3) all of BSC's receivables at the date of closing

(valued at roughly $128,000 as of October 31, 2017), (4) the company's vehicles (valued at

roughly $130,000 as of October 31, 2017).  The offer also provided that inventories and prepaid

items would be valued at closing (the methods for doing so being well understood), and the

amount of cash paid adjusted upward or downward depending on whether the inventories and

prepaid items values exceeded or fell below the October 31, 2017 figures.  It also provided that

BSC's loan obligation to Mr. Tripp would be forgiven.  Mr. Quigley made clear that he was

proposing a "cash deal" for BSC's assets, as had been long discussed, and he explained, in detail,

the basis for the proposed price (among other things).  Consistent with prior discussions and

communications, Mr. Quigley noted that he would have to "invest $20,000 to $40,000 in

environmental testing <u>before</u> I take possession of BSC.  If the ground is contaminated and I can't buy BSC, I don't get my money back."

96.	A true and correct copy of the "final offer" is attached hereto as Exhibit A.

**The Acceptance And Confirmations**

97.	The next day, Friday, February 9, 2018, Mr. O'Brien sent Mr. Quigley a text message, asking Mr. Quigley to call him.  Mr. Quigley called Mr. O'Brien after receiving the text message.

98.	Mr. O'Brien told Mr. Quigley that Mrs. Tripp had accepted Mr. Quigley's offer.

99.	Mr. O'Brien expressed no uncertainty whatsoever about the terms accepted, and asked no questions about the terms.

100.	Mr. O'Brien and Mr. Quigley proceeded to discuss arrangement for Mr. Quigley and his consultant to inspect the BSC plant on February 14, 2018, to work on the sustainability plan for the plant.

101.	Later that day, Mr. Quigley reached out to the gentleman whom Mr. Quigley was planning to hire as manager at "BSC" once he took over (the same gentleman he had suggested Mrs. Tripp hire), and advised him that he and Mrs. Tripp had a deal and that he would need his help in two to three months.

102.	Mrs. Tripp confirmed the existence of the agreement in emails on February 11 and 12, 2018.

103.	On February 11, 2018, she emailed Mr. Quigley, asking him who would be visiting BSC on February 14, 2018, and what Mr. Quigley would like to achieve by the visit.

104.	The February 14, 2018 visit was necessitated by, in furtherance of, and had been scheduled only because of the agreement that Mr. Quigley and Mr. O'Brien had reached on

February 9, 2018, and by inquiring about and assisting with the meeting, Mrs. Tripp acknowledged and affirmed the agreement.

105.    Mr. Quigley responded to Mrs. Tripp's inquiry by stating, "While we are at Bay State I would appreciate the opportunity to speak with Amy (BSC office manager), Joe (BSC acting plant manager) etc.  I think it will go more smoothly if you tell them in advance that we have a verbal agreement.  They should be told that I plan to continue operation of the plant as a crucible production facility and I look forward to working with them as members of the team."

106.    Mrs. Tripp responded the next day, February 12, 2018, saying, "Pete, Thank you for providing me with your itinerary for Wednesday.  I will talk to Joe and Amy about the reason for your visit."

107.    Mrs. Tripp thus once again acknowledged and affirmed the existence of the agreement.

108.    Indeed, Mrs. Tripp agreed to advise two BSC employees of the agreement and its meaning for them.

109.    Further, in her email of February 11, 2018, Mrs. Tripp wrote, "I will send along information supporting valuation of inventory tomorrow." This was further confirmation of the agreement:  There had been multiple discussions concerning, and an agreement that, the amount paid for inventory might be not the figure on the financials, but a figure corresponding to reality just prior to closing.  In offering the inventory valuation support, Mrs. Tripp was acknowledging that the parties were close to closing and the inventory value therefore needed to be confirmed, and, thus, was acknowledging the deal.  On February 12, she made a further reference to the pre-closing inventory valuation effort.

110.    On February 13, 2018, in reliance on the agreement, Mr. Quigley travelled to Massachusetts to conduct the planned plant inspection for the sustainability plan. The inspection took place the next day, as planned and approved and pursuant to the agreement reached on February 9, 2018. Mrs. Tripp was involved, once again acknowledging and affirming the agreement.

111.    On February 16, 2018, Mr. O'Brien sent Mr. Quigley a text message, saying, "Hope the visit was productive. Whenever convenient, please let me know how you'd like to proceed from here."

112.    The next day, Mr. Quigley told Mr. O'Brien that he had involved a lawyer to "put on paper what Susan and I have agreed to . . .." He indicated that he hoped to have a draft agreement by February 28, 2018. He also asked Mr. O'Brien to make sure that Mrs. Tripp not sign anything regarding the nearby pumping station and not scrap any additional equipment.[1]

113.    Neither Mr. O'Brien nor Mrs. Tripp contradicted Mr. Quigley.

114.    On February 23, 2018, Mr. Quigley advised Mr. O'Brien, by text message, that his attorney was back from vacation and that Mr. Quigley expected to have "something for you and Susan to review next week." Mr. O'Brien responded, asking if Mr. Quigley's attorney was planning to forward full contracts. Mr. Quigley responded, "Steve (Mr. Quigley's business consultant) and my Attorney originally wanted me to have Susan 'sign off' on what we agreed to do in the e-mail I sent to you. Last Friday before the Attny left I told him to include that information in a legal purchase agreement as not to waste time." While in the process of

---

[1]    Mr. Quigley had learned that the City of Taunton has construction plans that may affect the property, and he wanted to avoid Mrs. Tripp's agreeing to anything with the City that might affect the property he had agreed to buy and she had agreed to sell. The request as to equipment was based on Mr. Quigley's observation that Mrs. Tripp apparently had been disposing of equipment and material for scrap value.

composing this text message, Mr. Quigley received another from Mr. O'Brien, saying, "Susan just called me. She's going to call you."

**Mrs. Tripp's Reneging**

115.   Mrs. Tripp left a message on Mr. Quigley's cellphone voicemail about an hour later. She said, among other things, "I'd like to talk with you, I don't need to get into it too much over voicemail but just in case I don't catch you before the weekend I'm not going to go ahead and sell Bay State at the moment, it just doesn't feel right." She said she was sorry for the time Mr. Quigley had spent on the process.

116.   She did not say that no agreement had been reached.

117.   Mr. Quigley returned the call at 3:12 p.m., but reached Mrs. Tripp's voicemail. He left a message, saying she had agreed to sell to Mr. Quigley. He pointed out that he had devoted countless hours to the process of investigating, negotiating, and purchasing the company over the last year, and had hired and paid several people, and that it was a done deal. He said it was too late for her to change her mind, and that he would take it further if necessary.

118.   Mr. Quigley then called Mr. O'Brien and asked what was going on.

119.   Mr. O'Brien acknowledged that he did not agree with Mrs. Tripp and that he had told her that she could expect Mr. Quigley to be upset and to react as he had. He said there was nothing he could do.

120.   Mr. Quigley said that he would not let things go, and that it was not right that after a whole year of investigation/negotiation, Mrs. Tripp had attempted to back out because it didn't "feel right." Mr. O'Brien said that he was not sure why Mrs. Tripp was attempting to back out, and that he had told her she should go through with the deal. He added that he really couldn't help Mr. Quigley and already had spent too much time helping Mrs. Tripp. He

volunteered that he had told Mrs. Tripp this was not just about this deal, but about breaking a commitment to one of BSC's largest customers, if not its largest.

121.    Mr. Quigley spoke with Mrs. Tripp just after the call with Mr. O'Brien.   He reiterated that he had hundreds of man hours into the deal, and had spent a fair amount of money on lawyers, consultants, and accountants.   He asked her repeatedly why she had changed her mind, and she repeatedly said "it just doesn't feel right."

122.    Mrs. Tripp did not deny that she had changed her mind.

123.    Mr. Quigley pushed back and said he would pursue legal means, if necessary, to get the deal done.

124.    Mrs. Tripp did not deny that a deal had been reached, did not apologize, and did not offer to reimburse Mr. Quigley for the time and money he had devoted to the deal.

125.    Mr. Quigley asked Mrs. Tripp to think things over during the weekend, to talk with her father and Mr. O'Brien, and to call him back on Monday the 26th.

126.    She promised to do so.

127.    She never called.

128.    Mr. Quigley has demanded, in various ways, that the agreement be honored.

129.    BSC, by its agent Mrs. Tripp, has declined to honor the agreement.

## COUNT I

### (BREACH OF CONTRACT)

130.    Paragraphs 1 through 129 are incorporated herein by reference.

131.    Mr. Quigley and Mr. O'Brien reached an enforceable agreement pursuant to which Mr. Quigley was to purchase, and BSC was to sell, most of BSC's assets to Mr. Quigley, on the sole condition that testing shows that the real estate is not contaminated.

132.    Especially when read in the context of the long, heavily documented course of negotiation between Mr. Quigley and Mr. O'Brien, Mr. Quigley's March 8, 2018 "final offer" contained all of the material terms of the proposed contract for the purchase and sale:   It identifies the nature of the transaction, the buyer, the seller, the assets to be purchased, and the purchase price – all in sufficient detail – and it spells out the only pre-condition (absence of contamination) to closing.

133.    The final offer made clear what Mr. Quigley proposed to buy, from what, for how much, and on what condition.

134.    Mr. Quigley's final offer was a valid offer.

135.    The final offer was accepted.

136.    Mr. O'Brien expressly accepted the offer on February 9, 2018.

137.    Mr. O'Brien was authorized, both expressly and implicitly, to accept the offer on behalf of BSC.

138.    The oral agreement formed on February 9, 2018, is confirmed by writings authored and, for purposes of the law, signed by Mr. O'Brien and Mrs. Tripp, as agents for BSC.

139.    Mrs. Tripp confirmed the acceptance of the offer and/or independently accepted it, and confirmed the agreement, by her emails of February 11 and 12, 2018 (which contain expressions confirming the existence of the agreement); by her conduct in arranging and participating in Mr. Quigley and his consultant's plant inspection (an inspection that was necessitated only because there was an agreement and would not have been arranged had there been none); and by her failures to deny the existence of the agreement.

140.    Mrs. Tripp had actual and/or implied authority to bind BSC (or falsely represented, to Mr. Quigley's detriment, that she had such authority).

141.    Mr. Quigley detrimentally relied on Mr. O'Brien's and Mrs. Tripp's confirmations of the acceptance and existence of the agreement.

142.    Mr. Quigley's inspection of the plant on February 14, 2018, pursuant to the agreement constitutes part performance of the agreement.

143.    Mr. Quigley has demanded that BSC perform pursuant to the agreement.

144.    BSC has refused to perform pursuant to the agreement.

145.    Because unique property is at issue, money damages would be insufficient.

WHEREFORE, Mr. Quigley respectfully demands judgment requiring BSC specifically to perform pursuant to the accepted final offer of February 8, 2018, and providing for such other and further relief as is appropriate.

Dated:  May 30, 2018

PETER QUIGLEY,

By his attorneys,


_____
David B. Chaffin
BBO # 549245
WHITE AND WILLIAMS LLP
101 Arch Street, Suite 1930
Boston, MA 02110
Tel:  (617) 748-5200